# SUPREME COURT OF TENNESSEE,

FOR THE

# MIDDLE DIVISION.

NASHVILLE, . . . DECEMBER TERM, 1879.

4L   1
9L 379
12L 182
2pi 272

THE STATE OF TENNESSEE, *ex. rel.* W. A. KNIGHT, Trustee, etc., *v.* J. R. McCANN, Clerk. etc.

1. CONSTITUTIONAL LAW. *Salaries of public officers.* The Act of the Legislature of 1879, entitled "An Act to regulate and equalize the salaries of certain public officers," is unconstitutional, because repugnant to that provision of the Constitution which provides "No bill shall become a law which embraces more than one subject, that subject to be expressed in the title."

2. SAME. *Act of Legislature. More than one subject. Title.* If an Act contains more than one subject, and only one subject is expressed in the title, the whole act is a nullity.

---

FROM DAVIDSON.

---

Appeal in error from the Circuit Court of Davidson County. FRANK T. REID, J.

Attorney-General LEA, T. L. DODD, and GEORGE B. GUILD for The State.

---

State *v.* McCann.

---

E. H. EWING, JOHN L. T. SNEED, A. L. DEMOSS, ED. H. EAST, W. A. THOMA, and BAXTER SMITH for McCANN.

FREEMAN, J., delivered the opinion of the Court.

This is a petition for mandamus, filed in the Circuit Court of Davidson County by Knight, as Trustee, representing the County of Davidson, to compel the payment into the County Treasury of the sum of upwards of five hundred dollars, reported by McCann, as Clerk of the County Court, as having been received by him from fees of office from 1st of February to 1st of July, 1879.

This sum is reported as being the excess over and above the amount allowed by an Act of the General Assembly passed 29th January, 1879.

The Clerk, after making his report as required, declined to pay over this sum, hence this suit.

We take it, the case really stands before us as a case intended to test the constitutionality of the enactment referred to, and as such an unusual time has been allowed for its argument, that all parties might be fully represented and heard.

Both sides have been represented by counsel of the first standing and ability, from whose arguments we have had, probably, all the aid possible to be given in the solution of the questions presented.

We now proceed to give the results of our investigation, and the judgment of the Court on these questions.

State *v* McCann.

The following is the Act, so far as is necessary to quote it, for this discussion. It is entitled "An Act to regulate and equalize the salaries of certain public officers." It commences with the following preamble, expressive of the reasons for its enactment:

"Whereas, in some counties of the State Clerks of Courts and other officers *are* receiving from the fees of office as *allowed* by law, and from business incident to their office, by means of which they secure appointments the gift of courts and other appointing powers, sums greatly in excess of that allowed the Governor, or any of the Judges of the State; therefore,

Sec. 1. Be it enacted by the General Assembly of the State of Tennessee, That no Clerk of the Supreme Court, Clerk and Master of the Chancery Court, Clerk of the Circuit Court, Clerk of the Criminal Court, Clerk of the County Court, Trustee or Collector of Revenue, Register of Deeds, District Attorney for the State, or Secretary of State, shall receive, directly or indirectly, from fees, emoluments or perquisites of his office, nor as Commissioner, Trustee or Receiver, or from any position or place of trust or employment to which he may be appointed by any Court or Judge, any sum greater than two thousand dollars per annum.

Sec. 2. *Be it further enacted,* That every clerk or other officer enumerated in the first section of this Act, shall be required to make, under oath, and file with the Comptroller, if a State officer,

and with the County Judge or Chairman, if a County officer, on the first Mondays of January and July of each year, a true exhibit of all fees, emoluments and perquisites of office, trust or employment of office, received by him for services performed as such officer for the previous half year, and shall pay over to the State Comptroller, if a State officer, and to the County Trustee, if a County officer, any amount so in excess of said sum, two thousand dollars, no matter whether said sum arises from fees, emoluments or perquisites, or order or direction of said Court as *allowed* by law, or for pay for services as Special Commissioner, Trustee, Receiver or otherwise.

Sec. 3. *Be it further enacted,* That any officer who shall directly or indirectly evade the spirit of this Act by connivance with any person or persons, or otherwise in any manner, shape or form, evade the same by making out an incorrect report, shall be deemed guilty of a misdemeanor, and for such offense, upon conviction, shall be fined not less than five hundred nor more than one thousand dollars, which shall go to common schools in this State, and the office be declared vacant."

Then follows three other sections—the fourth authorizing the *Comptroller* of the State to employ a clerk at a salary of one thousand dollars; the fifth giving the Judges of the Courts, and Chairmen of County Courts, the right to authorize their clerks to appoint deputies, fixing the fees for such deputies, with certain other limitations, regulations

and restrictions not necessary to be referred to at present.

Sec. 6 gives like power to Judges or Chairmen of the County Courts, to authorize the Trustee or Collector of Revenue, under certain contingencies, to appoint one or more deputies to be paid out of the surplus of such office.

Sec. 7 gives like authority to Judges of Courts having exclusive criminal jurisdiction, when the business of their Courts shall require such an officer, to allow the Attorney-General to appoint an assistant Attorney-General, who shall be paid a salary not to exceed one hundred dollars per month, to be paid out of the surplus fees of the office of Attorney-General.

The Act took effect, it is provided, from and after its passage. We are called upon to decide the question whether this is a law or not. This is the real question in all cases, where the point of the conformity of an enactment of the Legislature to the Constitution of the State, or the Federal Constitution, is presented. The decision of this question by our American system has been imposed upon the Judiciary department of the Government. That duty is to be performed precisely as all other judicial duties should be performed, after careful and thorough examination, aided by argument of counsel, guided by authority, and in the exercise of the "clear, dry light of legal reason," uninfluenced by passion, prejudice, or the fear of consequences. We can as a Court neither

desire that the result shall be the one way or the other.    Perfect deference for all that is the law of the land should be felt by all, but, if possible, this feeling should be deeper and more controlling in the Judge than in all others.    This feeling of devotion, however, can legitimately only find its proper exercise when applied to what is law, and not to everything that is enacted.

In proportion as we reverence law, *and the law*, should we feel it our duty to strike down whatever proposes or is proposed to take its place, when found not entitled. to or able to make good that claim.    If this enactment is a law, then its mandates are imperative, before which all must bend, and which all Courts must promptly enforce. If not, it is to be obeyed by none.    Coming with all the accredited forms of an enactment of the Legislature, it is *prima facie* the law until the contrary shall be made to appear, clearly and satisfactorily.

The definitions of the term law, as found in our older text-books, and in the English writers, fail to express the American meaning of . that term.    Blackstone defines it to be " a rule of action prescribed by the supreme power in a State commanding what is right, and forbidding what is wrong."    Without criticising the redundancy of this definition in the last clause, as well as some inaccuracy pointed out by writers, we may say that this gives no proper definition of a law in what may well be termed the American sense.

State v. McCann,

In the first place we have no supreme organic power in a State, certainly nothing approximating to supremacy, or any proper idea of that term in any legislative or law-making body known to our system of government, whether State or Federal, supreme we may say within their sphere of action, but all limited by lines and barriers, theoretically at least definitely fixed, beyond which they not only have no power to act, but their acts must be held void, and infractions of the rule of right action prescribed for their conduct.

We might say properly that our Constitutions, State and Federal, are nearer to the idea of the " supreme power " in the State, when enforced, than anything else organically existent among us.   This would not be a strictly accurate statement, and cannot be taken literally;  for no law, whether supreme as a constitution, or inferior as an enactment of a Legislature, has any power whatever.   Law in any form in which it may be found, or in any accurate meaning of the term, is utterly powerless.   It can only give out influence, exercise power, when its requirements are enforced by intelligent will, directed to this end.

But passing from this, a definition of an American law will be sufficiently accurate for our present purposes, and possibly for all general purposes, as follows:   A rule of conduct prescribed to the State or people thereof, in accord with the Constitution of the United States, and of the State, when enacted by a State Legislature.   Other elements

possibly might be added, bringing out the idea more
fully, but this will suffice.

. The question that presents itself in every enact-
ment claiming to be a law is, does it conform
to these Constitutions? If it does, then it is a
law; if not, it has no title to reverence—is to
be disregarded, declared null and void, and treated
as never having been enacted.

This being the axiomatic rule in our system, it
would seem to be a waste of argument to say
that there can be nothing immaterial, nothing direc-
tory and which may be regarded or not, at the
option either of the Legislature, Courts, or anyone
else in these Constitutions. The mandates of these
Constitutions must always be imperative. That
which all are sworn to obey and enforce, from the
Justice of the Peace or Constable, to the President
of all the States, which is the test of all govern-
mental power, must surely be obeyed by all func-
tionaries at all times, in all places, and under all
circumstances. In the sphere of law, these are
the supreme laws—all else purporting to be law
must stand or fall, as it conforms or fails to con-
form to these—must be either obeyed as effective
and operative, or fall to the ground, as of no
force whatever.

This conclusion would follow as a logical sequence
from what is commonly stated to be the *power* of
our Courts to declare a law void, when in viola-
tion of these Constitutions. This is not an accu-
rate statement of the principle. There are no

State *v.* McCann.

powers, strictly speaking, in the judiciary. It is
all duty, and as such, imperative when the case
arises where judicial action is to be done. It is
true, there are what is known as discretions to be
exercised by the judge, such as granting continu-
ances, and the like, but all these are assumed to
be exercised under the guidance and regulation of
laws, and rules of practice well known, and *abuse*
of these legal directions is promptly rebuked and
corrected by the revising tribunals. Such being the
true theory of our system, it follows that when-
ever there is a want of conformity to these Con-
stitutions, it can never be passed over as indifferent,
for the Courts, as guardians of the Constitution,
under their oaths of office, have no discretion, and
duty, which is always imperative, demands the
violation shall be checked, and the Act to be
declared a nullity. Either the Constitution or the
Act must go down. There is no middle ground,
and the Act must fall.

Says Judge Cooley, Const. Lim., pp. 2, 3: "In
our American Constitutional law, the word ' *consti-*
*tution* ' is used in a restricted sense, as implying
the written instrument agreed upon by the people
of the Union, or of any one of the States, as the
absolute rule of action and decision for all depart-
ments and officers of the Government, in respect
to all points covered by it, which must control
until it shall be changed by the authority which
established it, and in opposition to which any Act
or regulation of any such department or officer, or

even the people themselves, will be altogether void."

"The term *unconstitutional law* must vary in its meaning in different States, according as the powers of sovereignty are or are not possessed by the individual or body which exercises the powers of ordinary legislation. Where the law-making department is restricted in its powers by a written fundamental law, as in the American States, we understand by unconstitutional law one which, being opposed to the fundamental law, is therefore in excess of legislative authority, and void. Indeed," he adds, "the term unconstitutional law, as employed in American Jurisprudence, is a misnomer, and implies a contradiction ; that enactment which is opposed to the Constitution being in fact no law at all. For the will of the people, as declared in the Constitution, is the final law; and the will of the Legislature is only law when it is in harmony with or at least is not opposed to, that controlling instrument which governs the legislative body equally with the private citizen."

Such has been the holding of this Court in numerous cases, and such the uniform theory of the current of cases on constitutional law in our State, as well as in every other State of the Union, with the exception, perhaps, of one or two, where slight departures have been allowed—California and Ohio being the only ones we have noticed. See Const. Lim., pp. 149.

The cases in these States are referred to with marked condemnation of the principle by that able

State *v.* McCann.

jurist. "The fact is this," he says, (and most truth-fully,) "that whatever constitutional provision can be looked upon as directory merely is very likely to be treated by the Legislature as if it was devoid even of moral obligation, and to be therefore disregarded. To say a provision is directory, seems, with many persons, to be equivalent to saying that it is not law at all. That this ought not to be so must be conceded; that it is so, we have abundant reason and good authority for saying. If, therefore," he concludes, "a constitutional provision is to be enforced at all, it must be treated as mandatory; and if the Legislature habitually dsiregard it, it seems to us that there is all the more urgent necessity that the Courts should enforce it."

These are words of wisdom from the pen of the ablest constitutional jurist now in our midst, and well deserves to be pondered by those whose duty it is to administer the law, and enforce its mandates, especially in the Court of last resort.

Assuming these principles to be beyond dispute, we proceed to the discussion of the question that stands at the threshold of this case—its "Title," as expressing the subject of the enactment, and whether it contains more than one subject in its body.

Article II. of the Constitution of 1870, section 17, is: "Bills may originate in either House, but may be amended, altered or rejected by the other." This is the same as the Constitution of 1834, but the Convention thought proper to add "*No bill shall*

become a law which embraces more than one subject, that subject to be expressed in the title." "All Acts which repeal, revive or amend former laws, shall recite in their caption or otherwise the title or substance of the law repealed, revived or amended." Whatever may be thought of the Constitution being directory, under other clauses, this is beyond all question mandatory. This Court has settled that question. In the language of Judge Nicholson, in *Cannon* v. *Mathes*, 8 Heis., 518: "The command is positive that no law shall embrace more than one subject, and it is equally positive that that subject is to be, or shall be, expressed in the title. To constitute a valid law under this provision, the bill must not embrace one subject alone, but that subject must be embraced in the title."

We are content to take the statement of the result of the authorities as given by Judge Nicholson as the point of law adjudged, as found in the conclusion of that opinion, as a fair statement of the principle embodied in this provision of the Constitution. He says, " It is obvious, therefore, that the true rule of construction as fully established by the authorities is, that any provision of the Act directly or indirectly relating to the subject expressed in the title, and having a natural connection thereto, and not foreign thereto, should be held embraced in it." The principle may admit of considerable latitude in its application, but the principle we believe has been conceded in all our opinions on this question to be sound.

State *v.* McCann.

Conceding this, we proceed to bring this enactment to this test  The title is "An Act to regulate and equalize the salaries of certain public officers." Assuming the principle of construction of constitutions and statutes to be, as given by Chief Justice Marshall, 4 Wheat, 202–3, approved by this Court, Peck R., 437, that while the spirit of a constitution or statute is to be respected, not less than the title, that the spirit or meaning is to be collected from its words, we examine this title to see what is its natural and fair meaning from the language used. It is to "regulate and equalize the salaries of certain *public* officers." In fairness, it ought to be construed to mean, to regulate, so as to equalize, these salaries, as that is more nearly what was probably intended or in the view of the framer of this bill. To regulate, with the end of rendering equal, may be taken as its fair meaning, without any great strain on a liberal construction of the words.

The word "regulate" is defined by Webster to "adjust by rule or method, or established mode; to direct by rule or instruction; to subject to governing principles, as the laws which regulate the succession of the seasons," by way of illustration as he gives it.

The meaning of the language then is to adjust by a rule the salaries of certain public officers so as to equalize them. This of necessity implies the existence at the time of the public offices to be regulated, with salaries attached, or to be at-

tached to such offices, by the rule there to be established. This must be so, or else we have the logical absurdity of a body enacting a rule for the action, and a mode of adjustment for that which is nonexistent. This we cannot attribute to a legislative body, nor is a fair meaning of the language used. This being the meaning of the language used in the title, and its fair construction, we look to the body of the Act and see if it conforms to it. Unquestionably the first three sections look to this subject (whether effective for the end or not we need not at present inquire), still these sections complete all that is probably fairly included in the title; at any rate, at this point this subject is for the time ended and complete. This we think can be demonstrated by looking at, first the preamble and then the substance of these sections.

The preamble, as said by this Court in *Trott* v. *McGavock*, 1 Yer., 473, (Cooper's Ed.) "is the key to unlock the mind of the Legislature," and the well established rule is to look at this to arrive at the intent and purpose of the Act.

That preamble is, "Whereas, in some counties of the State, Clerks of Courts and other officers *are* receiving from the fees of office as allowed by law, and from business incident to their office, by reason of which they secure appointments the gift of Courts, and other appointing powers, sums greatly in excess of that allowed the Governor, or any of the Judges of the State; therefore," etc.

State *v.* McCann.

That is, to remedy the above enumerated existent evils, which are assumed to exist in certain offices, under the present existent regulations of the law, the enactment is to be made.

This is in precise accord with the construction we have given the language of the title—that is, that it refers, of necessity, to public offices, and offices where, by experience, these evils had been found, or were assumed to exist, and proposes that these offices or officers shall be regulated and their *salaries* equalized. Then follows an enunciation of the particular officers who are to be thus regulated and their *salaries*, as they are called, equalized—that is, rendered equal. We may remark here, that of those officers named, only one has any salary at all, and that we believe only in part, to-wit: the Secretary of State. But passing this, they are all named, from a clerk of the Supreme Court of the State down to a district attorney, and it is provided as the regulation on the subject named, to-wit: the "salary," they shall none of them receive any sum greater than two thousand dollars.

It would have been, perhaps, more in accord with the real purpose of the Act to have said "shall not retain or keep any greater sum than two thousand dollars," for the evident idea is that they are to. go on and receive, as before, but shall not be allowed to keep what is thus received.

This, however, completely expresses the whole purpose of the Legislature as to the amount of salary to be received, that is, no more than the

sum specified, and this sum is fixed on as the element of equality in the Act.

The next section (2) provides the means by which the amount received shall be ascertained, so as to make effective the regulation thus adopted, and requires a report, in case of State officers, to be made to the Comptroller of the State, and if a county officer, to the Judge or Chairman of the county court, of the amount of fees received, this report to be made on the 1st of January and July of each year.

The officer is then required to pay over to the Comptroller of the State, if a State officer, or to the Trustee, if a county officer, any amount in excess of two thousand dollars, from whatever source derived in his official capacity. And so this matter is regulated as to these officers who " are receiving from fees of office as allowed by law " such salaries as are deemed objectionable, and who are intimated in this preamble to have " used the money not very properly," by securing appointments, etc.

Then follows section 3, that fixes a penalty for failing to comply with these requirements, or attempting to evade them by making a false report, and these officers are to be deemed guilty of a misdemeanor, and for such offense, upon conviction, are to be fined not less than five hundred nor more than one thousand dollars, this money to go to the support of common schools in the State, and his office is to be declared vacant.

State *v.* McCaun.

We can scarcely conceive of anything else that could be added to carry out the expressed intention, so far as the form and correctness of this Act is concerned. The reasons for it are given in the preamble, with which we have nothing to do, except in arriving at its purpose. The regulation of the salary is established as the future rule on this question as the Legislature seemed to desire, and exactly as was desired, and the mode of ascertaining when one of these officers should receive in excess of the sum specified, to whom it shall be paid over, and then the penalty to be inflicted, and what the fine shall be appropriated to when incurred.

It is beyond all question that this comports with the idea or subject expressed in the title, and is included in it, and under it, because it professes and attempts to regulate existing offices, and the emoluments received from their employment, under the present regulations of these offices, under the then existing laws as to such emoluments, which are stated to be "received by them as allowed by law," that is, now allowed.

This, then, being demonstrated to be the meaning of the title, its subject may be, and must be, stated to be the regulation of existing officers' salaries or fees, so as to produce equality, as we have assumed in the preceding part of this opinion. This being its subject, all that is naturally and fairly included under this subject may be done by one law. Any regulation to equalize salaries of

certain existent public officers is fairly within the scope of this subject. But it may be remembered, a law can have but one subject, " and that subject must be expressed in the title." It cannot embrace more than one subject and become a law, for the Constitution says: " No bill shall *become* a law which embraces more than one subject." If this provision is infracted, it is only a bill, it can never get beyond this and reach the dignity of a law, when tested by the Judiciary, whose business and duty it is to see. that the Constitution remains supreme over all departments of government, as well as over the citizen.

We next look at the 4th section, and here we find a new departnre—an independent enactment— with reference to an office not then known to the law, or if so, legislated upon as a new creation, not being named as among the offices where the evils to be remedied existed, and an enactment is found as follows :

" *Be it further enacted,* That the Comptroller be and is hereby authorized to employ a clerk at a salary not to exceed one thousand dollars per annum."

Now, if this provision of the Constitution is to be held to have any meaning, this cannot be held to be a compliance with it. Could any man read this title and even suspect that it involved this subject, or had for its object the appointment by an officer of a clerk and to fix his salary arbitrarily at one thousand dollars ? We opine not.

The object is to regulate salaries and equalize them. Literally, this would require the bill to regulate the salaries legislated upon as to produce equality in them. But the first part of the bill, as the principle of equality, fixes the maximum at two thousand dollars for the officers regulated by it. Here is an enactment that is to be held as having the same end (if the law is to be sustained) which fixes the maximum at one thousand dollars. These salaries may be equalized by this process, but we are unable to see the principle, except we say that one thousand, as a maximum in the Comptroller's office, is the same or equal to a maximum of two thousand dollars in the case of the other enumerated officers.

We leave this question to be solved by those who may be able to do so. The writer of this opinion is unable to do it. On the face of the enactment, however, it has no relation to, or connection, either direct or remote, with the expressed purpose of the Act, with the subject proposed to be legislated upon in the title. It is independent legislation on a different subject, to-wit: the appointment of a clerk by an officer. That is evident from the body of the Act, and its specified offices and officers; it was not one where the grievances assumed to be remedied by the body of the Act, and referred to by the preamble, pointing to its purpose, had been found.

If the Act itself is to be held in its leading feature to have embodied the purpose or subject

of the Legislature, so as to conform to the require-
ment of one subject, and that to be expressed in
the title, then this subject, or the subject of this
section, is not included in the subjects referred to
in the title.

The Legislature itself having shown the subject
by the leading provisions of the bill in the first
three sections and preamble, we have but to take
this, their own exposition of the subject legislated
upon, to be sure that a clerk for the Comptroller's
office is not included in this purpose. The Comp-
troller's salary is not regulated by the bill, nor
intended to be. We may assume that none of
the evils to be remedied had been found there.
No need that the salary of that officer should be
regulated, with a view to its equalization. But it
seems to have occurred to some one that that offi-
cer needed a clerk to assist him in his duties,
though his salary did not happen to need any
equalization, and so he was given authority to ap-
point one, his salary, when appointed, not to ex-
ceed one thousand dollars, and it was so enacted.
No doubt a proper piece of legislation, but in fact
having no more connection or relation to the sub-
ject of the bill, as stated in the title, or as shown
in its leading sections, than if the Mayor of the
town of Murfreesboro had been authorized to em-
ploy a clerk as an amendment to its charter, with
a like salary; or the town of Columbia to have
an additionall justice of the peace entitled to re-
ceive the fees allowed by law to that position.

So far from effecting an equalization of what is called a salary in the bill of any officer, this salary is to be paid as the salary of other State officials generally are paid, out of the State treasury, and the appropriation bill passed by this same Legislature contains an item of two thousand dollars for its payment.   Whose salary or fees is to be reduced, or regulated, or equalized by this, we have not been able to see, nor what possible connection it can have with the subject of equalization of salaries of the " certain officials " referred to in the preamble, we hardly think any man will be able to learn from reading this bill.   In a word, we cannot see but what the appointment of a clerk by any other official in the State, or in fact, any other desirable enactment might not just as well have been inserted into this bill as the one here found.

If the Constitution is to be regarded as the supreme law, then a law containing more than one subject, and that one subject expressed in the title, is in violation of the Constitution, and must be held so as long as we adhere to the plain meaning of that instrument.

If a provision, that none of the enumerated officers shall receive more than two thousand dollars in any way from the fees or perquisites of their offices, is a regulation equalizing the salaries of such officers, as seems the view of the Legislature by this Act, then  unless a clerk, to be paid one thousand dollars for his services out of the treas-

ury, in the Comptroller's office in some way tends to or is related to that desirable end, unquestionably there are two subjects legislated upon in this bill, and the latter is not referred to or expressed in the title of the Act, or we may add, is it seen that it can possibly have been conceived it had any connection with the purpose of the regulations established by the bill.

We need go no further. Either the Constitution must give way or the bill must. There is but one answer to this question. The Constitution must stand, and by its mandate no such "bill can become a law," the effort to make it so is abortive—and it must be held void in the performance of the duties of our position from which we dare not shrink.

The enactment being a nullity for this reason, we do not deem it proper to either refer to or discuss the other questions presented in argument as to conformity of the general or particular provisions of this bill to the Constitution, as it is not a law, these provisions as they stand in the bill are ineffective, and therefore do not call for construction or decision.

In conclusion, we but add that the provision of the Constitution is not of difficult understanding, may readily be conformed to by minds reasonably well versed in the language of our jurisprudence, by careful attention in the preparation of the bills proposed to be enacted. Such attention is a most desirable end to be attained in the action of our

legislative body.  A construction of the Constitution tending to produce this result, has much to recommend it as a matter of public policy.  ·

Be this as it may, the theory of this Court is that the Constitution must control, and the principle is settled that whenever an enactment is in violation of that instrument, it must and will be declared void.  This Act being such, is so declared.

The judgment is reversed, and the mandamus dismissed.

Cooper, J., dissents.